492 F.2d 1123
 6 ERC 1513, 4 Envtl. L. Rep. 20,329
 ENVIRONMENTAL DEFENSE FUND, INC., et al., Plaintiffs-Appellants,
v.
CORPS OF ENGINEERS OF the UNITED STATES ARMY et al.,
Defendants-Appellees, Tennessee-Tombigbee Waterway
Development Authority and Tombigbee River Valley Water
Management District, Intervenors-Appellees.
 No. 72-2874.
 United States Court of Appeals, Fifth Circuit.
 April 19, 1974.
 
 Richard S. Arnold, Texarkana, Ark., Jon T. Brown, Washington, D.C., for plaintiffs-appellants.
 Irwin Goldbloom, A. Theodore Giattina, Civ.Div., Morton Hollander, Civ.Div., U.S. Dept. of Justice, Washington, D.C., for Corps of Engineers.
 John H. Gullett, Washington, D.C., for intervenors.
 Hunter M. Gholson, Water Development Authority, Columbus, Miss., for Tennessee-Tombigbee.
 Fred M. Bush, Jr., Water Management District, Tupelo, Miss., for Tombigbee River Valley.
 H. M. Ray, U.S. Atty., Oxford, Miss., for defendants-appellees.
 Before GOLDBERG, CLARK and RONEY, Circuit Judges.
 CLARK, Circuit Judge:
 
 
 1
 This is an environmentalist action to enjoin the construction of the Tennessee-Tombigbee Waterway, a navigation project in Mississippi and Alabama. The appellate issue is whether the United States Army Corps of Engineers complied with the duties imposed by the National Environmental Policy Act of 1969 (NEPA).[1] The plaintiffs assert that the Corps did not fulfill the basic intent of NEPA that federal agencies utilize procedures which assure that environmental considerations will be incorporated in their decision making on every major federal action. They claim that the decision to construct the Tenessee-Tombigbee Waterway, which predated NEPA's enactment, either was never seriously reconsidered, or that the decision was based on a study which was only one-third complete. Additioinally, they challenge the correctness of the district court's findings that the Corps of Engineers made a sufficiently detailed environmental impact statement and otherwise complied with the procedural mandates of NEPA. They finally contend that the district court erred in refusing to hear evidence and determine whether the Corps arbitrarily weighed the merits of the environmental, economic and technical values inherent in construction of the proposed project.
 
 
 2
 We have considered both the failure-to-make-meaningful-reconsideration and the decision-based-on-an-incomplete-study aspects of the claim of prejudgment and find neither to be a ground for reversal. The record demonstrates no mistake of law and no clear error of fact in the district court's holdings that the Corps satisfied NEPA's various procedural requirements. The district court's refusal to review the merits of the Corps' determination to proceed with the project is not reversible error since that determination, although normally subject to review under the Administrative Procedure Act,[2] has been superseded by a congressional decision that the waterway should go forward, which was made after a legally sufficient environmental impact study had been filed and debated. We affirm.
 
 
 3
 The opinion of the district court, 348 F.Supp. 916, contains a broad description of the construction details of the Tennessee-Tombigbee Waterway project and the background of the present litigation. The following discussion is included only for ease of reference. The waterway is a navigation project to connect the Pickwick Pool of the Tennessee River with the navigable portion of the Tombigbee River so as to provide a canal between the Tennessee Valley and the tidewater port of Mobile.
 
 
 4
 The idea of connecting the Tennessee and Tombigbee Rivers extends back at least to the beginning of the nineteenth century.[3] In 1874-75 the Corps of Engineers, at the direction of President Grant, conducted its first feasibility study of the Tennessee-Tombigbee connection. At that time the Corps concluded that it was technically possible to build the canal, but they doubted there would be sufficient commerce to justify the expenditure. Subsequent feasibility studies were conducted by the Engineers in 1913, 1923, 1932, 1938, 1945, 1960 and 1966. As late as 1951 the Corps gave the waterway an adverse economic report and placed the project in the category of proposals deferred for restudy. However, as a result of more recent re-evaluations indicating that the anticipated benefits exceed the estimated costs of construction and maintenance, the Corps has recommended constructiion.[4]
 
 
 5
 After the defeat of several similar bills prior to World War II, Congress authorized federal funding of the Tennessee-Tombigbee Waterway in 1946, but during the subsequent 24 years made no appropriations. Prior to the passage of the initial legislation appropriating funds for the construction of the first phase of the waterway, Congress enacted NEPA. Later in 1970, legislation was enacted providing $1 million for the start of construction in the fiscal year 1971. The following year $6 million was appropriated for use in fiscal 1972, and an additional $12 million has now been appropriated for fiscal 1973.
 
 
 6
 When NEPA became law, the Mobile District Office of the Corps of Engineers, which has responsibility for waterway improvements in the Tombigbee Valley, created an Environmental Resources Branch. Between March 1970 and April 1971, a six man team composed of employees of this branch conducted a study of the environmental impact of the proposed waterway. During the course of this study, the team sought information and advice from academic authorities and governmental agencies that had expertise in the environmental problems of the Tombigbee Valley. This study resulted in a preliminary draft statement of what the team regarded as the significant environmental effects of the project. The preliminary draft was then subjected to internal review procedures established by the Corps. Subsequently, the draft was reviewed by three independent consultants experienced in the fields of ecology, hydrology, and environmental design. Comments and criticisms were also solicted from academicians and federal and state agencies having special expertise or legal responsibilities relevant to the impacts of the project. On April 20, 1971, following modifications and further internal review, the final environmental impact statement was submitted to the Council on Environmental Quality (CEQ), an environmental group created by NEPA to act as consultants to the President.[5] The CEQ did not rule adversely on the statement. The general import of the statement and the details of the CEQ's action were directly brought to the attention of Congress in the course of floor debate over approval of the 6 million dollar appropriation for construction of the initial phases of the Waterway which were included in the 1971 Public Works Act.[6]
 
 
 7
 The start of project construction was enjoined by the District Court for the District of Columbia, 331 F.Supp. 925 (1971). Subsequently, the case was transferred to the District Court for the Northern District of Mississippi which, after issuing the decision that is the subject of this appeal, dissolved the preliminary injunction. Construction of the project has been underway since that dissolution.
 
 Corps Prejudgment
 
 8
 Plaintiffs take the position that the decision to build the waterway, which had been reached before NEPA was enacted, was never really reconsidered. They reason that the environmental impact statement prepared by the Corps and approved by the court below is the product of post hoc rationalizations which merely generated a bulk of paper rather than a written demonstration that the Corps gave meaningful consideration to ecological factors in its decision making. Criticism is also leveled at the use of a three-part approach to environmental considerations connected with this project. Plaintiffs assert that the plan to complete the latter two phases of the total environmental study as construction of the project proceeds resulted in a first-phase environmental impact statement that was a tentative, preliminary document incompatible with NEPA's 'detailed' requirement.[7]
 
 
 9
 At the heart of the first pre-judgment issue, is whether plaintiffs proved that the Corps acted perfunctorily in its compliance efforts. NEPA commands 'full good faith consideration of the environment,' not formalistic paper shuffling between agency desks. Calvert Cliffs' Coordinating Comm. v. Atomic Energy Commission, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1113 n. 5 (1971). Whenever a NEPA based challenge is raised as to a project that was planned and approved before the Act's effective date, the agency involved is vulnerable to charges of institutional bias if its ultimate decision under NEPA is in favor of proceeding with the work it previously approved or initiated. It is obviously preferable that environmental studies and their evaluation occur before the agency becomes committed to a project. Boston v. Volpe, 464 F.2d 254, 257 (1st Cir. 1972). However, as plaintiffs recognize, we cannot at the same time apply NEPA retroactively and reflexively condemn the required effort to comply retroactively with the Act's commands. The possibility that a group which has created or published its concurrence in a project will continue to favor it despite NEPA cannot be a bar to compliance. Therefore, this court adopts the essence of the test used in Environmental Defense Fund v. Corps of Engineers, 470 F.2d 289, 296 (8th Cir. 1972). An agency's actions in a situation of this type are not viable if the proof discloses that the agency proceeded to perform its environmental tasks with less than 'good faith objectivity'.[8]
 
 
 10
 The most cogent proof that plaintiffs offered in support of their thesis of mere formalism consisted of two excerpts from letters of the Mobile District Engineer for the Corps, which are set out in the margin.[9] While these letters convey a spirit of confidence on the part of the writer that the project would be found to be acceptable environmentally, they do not necessarily establish that the Corps' pre-NEPA decision to go ahead with the project would not be reconsidered. It must be borne in mind that these quoted excerpts sought to emphasize that the Corps intended to give the fullest possible consideration to the environmental consequences of the project-- to the extent of changing it for the better after it had met NEPA's mandates. The statement that 'construction could begin prior to the completion of the entire environmental study' is fully compatible with the conclusion that construction would commence only after the first phase of the study had been properly completed in compliance with NEPA. Acceptance of this interpretation was implicit in the district court's finding as to the sincere objectivity of the Corps' first phase study and statement. These letters fall far short of demonstrating that this finding was in error.
 
 
 11
 As to the second prejudgment issue, consideration must be given to the three-phase approach to compliance that the Corps is taking to apply NEPA to the Tennessee-Tombigbee project. Plaintiffs say the use of a mode of compliance which reached a decision with two phases yet uncompleted proves that the phase one environmental impact statement was not detailed 'to the fullest extent possible' and establishes that the statement was a superficial initial exposition of the ecological consequences of constructing the waterway. The soundness of the assertion depends upon whether phases two and three were necessarily integral parts of the decision to proceed with construction or were to be separate, subsequent efforts of the Corps to maximize the environmental benefits and minimize the adverse effects upon the natural quality of this region. The defendants take the latter tack. This too was the description of the three-part approach given by Senator Stennis, a supporter, in congressional debate.[10]
 
 
 12
 The issue of whether prejudgment is inherent in the three-part approach is one that we may resolve by the approach taken for appellate review. We will assume for purposes of determining the sufficiency of the phase one statement under NEPA that it must stand the test aline-- i.e., in and of itself it either must meet the requirements of NEPA or fail. We will not consider reference to or support from later efforts as bootstraps which can lift out any deficiencies that may exist in the initial phase. By the same token, the mere existence of a continuing program to minimize environmental damage and maximize benefits should never be allowed to rule out the possibility of initial compliance. To take such an approach would mean that commendable attempts to carry the wholesome spirit of NEPA past its imperative letter would vitiate an otherwise valid compliance effort.
 
 
 13
 Corps Compliance with Procedural Requirements
 
 
 14
 A preliminary, fundamental question is: What is the plaintiffs' burden of proof in actions challenging agency compliance with Section 102 procedures?[11] The court below required that the plaintiffs establish their claims by a preponderance of the evidence. In a lengthy, articulate opinion another district court in this circuit has adopted a rule that could produce a contrary result. This latter court would only require that a plaintiff make a prima facie showing that an agency has failed to adhere to the requirements of NEPA, whereupon the agency that has the responsibility to make the environmental assessment must then prove its compliance by a preponderance of the evidence. Sierra Club v. Froehlke, 359 F.Supp. 1289, 1334 (S.D.Tex.1973). Cf. Ely v. Velde, 451 F.2d 1130, 1138-1139 (4th Cir. 1971). The facts and issues of Sierra Club v. Froehlke are not before us, and our ruling intends no indication of the validity of the standard applied there. However, the action of the court below in the case sub judice, in applying the standard burden of proof procedure, was correct.
 
 
 15
 The plaintiffs have insisted throughout this litigation that the environmental impact statement filed by the Corps was deficient on three grounds: (i) the previously made decision to construct the waterway was never truly reexamined; (ii) the statement disclosed on its face that it was incomplete because detailed investigations of environmental matters were to take place in the future; and (iii) testimony of scientific experts disclosed omissions in the statement. Our preceding disposition of issue (i) was based upon the trial court's permissible choice between two broad conclusions of fact, neither of which was based upon controverted facts. Ground (ii) was eliminated as a fact issue by the review procedure adopted in this court. The nature of the plaintiffs' attack on ground (iii) is entirely compatible with the imposition of the usual burden of proof standard, since none of the necessary facts were in the exclusive possession of the Corps. Campbell v. United States, 365 U.S. 85, 96, 81 S.Ct. 421, 5 L.Ed.2d 428 (1961); McCormick on Evidence 337, at 787 (2d ed. 1972). Plaintiffs remaining procedural contentions-- that Section 102(B) and (D) were violated-- are similarly based on the establishment of equally available or uncontroverted general facts.
 
 
 16
 At the threshold, we must determine the meaning of NEPA's requirement that agencies comply with the procedural duties imposed under Section 102(2) 'to the fullest extent possible.' Legislative history discloses that the phrase, which in the initial Senate version modified only Section 102(1), was made applicable to Section 102(2) at the conference level.[12] The standard established by this language requires an agency to comply with the procedural directives of NEPA 'unless the existing law applicable to such agency's operations expressly prohibits or makes full compliance with one of the directives impossible.' Calvert Cliffs' Coordinating Comm. v. Atomic Energy Commission, 146 U.S.App.D.C. 33, 449 F.2d 1109, 1114-1115 (1971). Although its language is broad, the phrase was not, as the district court correctly observed, intended to require perfection in agency compliance with NEPA. Environmental Defense Fund v. Corps of Engineers, 342 F.Supp. 1211 (E.D.Ark.), aff'd, 470 F.2d 289 (8th Cir. 1972). We must interpret the requirements of NEPA according to a 'rule of reason,' Natural Resources Defense Council v. Morton, 148 U.S.App.D.C. 5, 458 F.2d 827, 834 (1972), recognizing on the one hand that the Act mandates that no agency limit its environmental activity by the use of an artificial framework and on the other that the act does not intend to impose an impossible standard on the agency.
 
 
 17
 These procedural considerations bring the process of our reasoning to grips with the issue of whether the district court correctly held that the record disclosed no lack of proper discharge of the procedural duties imposed upon the Corps by Section 102 of NEPA. This section is the part of NEPA which contains specific provisions designed to regulate the activity of federal agencies in a manner that will compel proper consideration and compliance with the general policies and goals of the Act. These 'action forcing'[13] provisions fall into two categories-- requirements as to methodology and writing requirements.
 
 
 18
 Subsections 102(2)(A), (B), and (D) through (H) contain directives that are intended to insure the integration of sound environmental planning principles and methods into normal agency procedures. Subparagraph (A) requires the utilization of a 'systematic, interdisciplinary approach' that will insure the combination of natural and social sciences in agency decision making. Subparagraph (B) requires that agencies, in conjunction with the CEQ, develop methods and procedures that will give 'presently unquantified environmental amenities' appropriate consideration along with economic and technical factors. Subparagraph (D) requires that agencies 'study, develop, and describe' appropriate alternatives to any course of action they decide to recommend.[14] Subparagraphs (E) through (H) provide for the coordination of environmental planning on the local, national, and international levels.
 
 
 19
 The remaining subsection, 102(2)(C), contains requirements for both methodology and writing, but its principal thrust is to require documentation. It demands that before approving a major project 'significantly affecting the quality of the human environment' every federal agency must file a 'detailed statement' analyzing the environmental impact of and the alternatives to the proposed project. This subsection has aptly been described as the 'full disclosure requirement' of NEPA. Environmental Defense Fund v. Corps of Engineers, supra. Most of the litigation involving NEPA to date has concerned compliance with this subsection of the Act.
 
 
 20
 As recognized by the court below, full compliance with Section 102 requires not only the filing of a sufficient impact statement as dictated by subparagraph (2)(C), but also strict adherence to the procedural requirements contained in the other subsections of Section 102. In their complaint the plaintiffs assert that the Corps violated Section 102(2) in general and, in particular, that they failed to adhere to the procedural requirements of subparagraphs (A), (B), (C) and (D). After an extensive trial on the merits, the district court made detailed individual findings that the Corps had fully complied with each of the applicable provisions of Section 102. The plaintiffs focus their appellate attack in this area on three specific issues: first, the Corps is in violation of Section 102(2)(B), because it has not developed innovative methods and procedures that would allow decision makers to assign values to presently unquantified environmental factors; second, the Corps has violated Section 102(2)(D) because it has not developed and described alternatives to the waterway system, particularly the alternative of increased reliance on railroads for the movement of goods; and third, there are significant omissions from the data required to be included in the Section 102(2)(C) impact statement. We shall discuss these issues seriatum.
 
 
 21
 The claimed violation of subsection 102(2)(B)[15] is based upon the absence of any rational articulation of a 'scheme of values' for the economic, technical and environmental factors that were considered in deciding to recommend the construction of this project. Plaintiffs contend that without some established scale by which to measure, no one can determine how benefits and detriments within each of these broad general groupings were 'traded off' in reaching the decision to recommend construction. The assertion is further made that the Corps' three-phase approach to environmental consideration demonstrates a failure to identify and develop methods and procedures that would insure appropriate consideration of environmental values-- a failure that not only violates Section 102(2)(B) but also indicates that the Corps has not detailed its Section 102(2)(C) statement 'to the fullest extent possible.' Finally, plaintiffs object to the inclusion of environmental benefits, i.e., recreational values, to bolster the cost-benefit ratio, without any concomitant debit accounting for any of the ecological losses they attribute to the project.
 
 
 22
 Plaintiffs' criticism of the one-sided economic use of environmental values is impressive. However, the problem with plaintiffs' position is that subsection (B) cannot be fairly read to command an agency to develop or define any general or specific quantification process. Plaintiffs concede that compliance with this subsection does not require that every environmental amenity be reduced to an integer capable of insertion in a 'go-no go' equation. They must further acknowledge that many environmental values cannot be fixed even within a given project area, and that others are bound to vary in value from place to place and time to time. develop methods and procedures that the agency affected to 'identify and develop methods and procedures' to insure that the environmental qualities are 'given appropriate consideration in decisionmaking along with economic and technical considerations,' order no more than that an agency search out, develop and follow procedures reasonbly calculated to bring environmental factors to peer status with dollars and technology in their decision making. We agree with the ultimate thrust of the district court's legal and factual conclusion, which was that the Corps' methodology satisfied subsection (B) by making a good faith attempt to weight and weigh ecology in reaching its ultimate approval.[16] Perhaps something more innovative than the team approach could have been conceived. Perhaps, too, time and experience may bring NEPA compliance procedures closer to the ideal sought by plaintiffs. But given today's of the theoretical, practical, factual and legal, we remain convinced that blend of the theoretical, practical, factual on this point were correct.
 
 
 23
 Plaintiffs advance a related contention-- that the cost-benefit ratio set out in the impact statement was based upon an arbitrarily low interest rate factor (3 1/4%), and consequently, the Corps' economic evaluation of the waterway's desirability was in violation of 33 U.S.C. 701a.[17] Any resolution of such an issue is necessarily dependent upon our answer to two fundamental questions: (1) whether this benefit cost statute creates a remedy cognizable by the courts; (2) whether the statute, which by its terms applies only to flood control projects, also affects a navigational project like the one here. Our resolution of the first question precludes us from reaching the second question or the merits of plaintiffs' contention.
 
 
 24
 Before the enactment of the Administrative Procedure Act, 5 U.S.C. 702 et seq. (1970), the Supreme Court held that 33 U.S.C. 701a created no right to judicial review of the benefit-cost analyses it required. Oklahoma v. Guy F. Atkinson Co., 313 U.S. 508, 61 S.Ct. 1050, 85 L.Ed. 1487 (1941). Plaintiffs contend that the Administrative Procedure Act and NEPA require a reevaluation of the power of the courts to review the merits of an agency's 'determination of benefits and costs under Section 701a.' The contention was similarly advanced in Environmental Defense Fund, Inc. v. Froehlke, 473 F.2d 346 (8th Cir. 1972), which involved a flood control project. There, the Eighth Circuit held that while Section 701a did not authorize continuing court evaluation of cost-benefit decisions on such a project, NEPA had independently created a duty to reappraise the costs and benefits of major federal projects and that this NEPA appraisal was subject to judicial review. Thus, it became immaterial for that court to gauge review rights under Section 701a. Since we agree that NEPA requires a more comprehensive and pervasive weighing of costs and benefits than Section 701a contemplates, whatever rights may exist under that statute have been subsumed by NEPA insofar as our review of the Tennessee-Tombigbee project is concerned.[18]
 
 
 25
 NEPA expressly refers to agency consideration of alternatives to the proposed action, not once, but twice. In addition to subsection 102(2)(D),[19] subsection 102(2)(C)(iii) requires that the detailed statement contain a comment on 'alternatives to the proposed action.'[20] Plaintiffs center upon the opening wording of subsection (D) 'study, develop and describe' as imposing on the agency involved a more affirmative duty than simply writing out a description of such alternatives as might be thought to exist. Plaintiffs contend that the Corps failed to develop any alternatives other than alternate waterway routes, and more precisely, that they failed to develop the possibility of increased utilization of railroads as an alternative to the construction of any waterway at all. The district court dismissed this contention with a brief holding that alternatives had been adequately analyzed, studied and developed.
 
 
 26
 Clearly, Section 102(2)(D) is supplemental to and more extensive in its commands than the requirement of 102(2)(C)(iii). It was intended to emphasize an important part of NEPA's theme that all change was not progress and to insist that no major federal project should be undertakne without intense consideration of other more ecologically sound courses of action, including shelving the entire project, or of accomplishing the same result by entirely different means. In Natural Resources Defense Council, Inc. v. Morton, supra, the District of Columbia Circuit recognized that this section did not intend to limit an agency to consideration of only those alternatives that it could adopt or put into effect. We agree. The imperative directive is a thorough consideration of all appropriate methods of accomplishing the aim of the action, including those without the area of the agency's expertise and regulatory control as well as those within it.
 
 
 27
 The Corps' action in considering other waterway routes to connect the Tombigbee and Tennessee River systems constitutes no more than a beginning in the process of complying with subsection (D). However, the impact statement does expressly note that the Corps had conducted economic studies for accomplishing the transportation purposes of the waterway by means of rail, pipeline, truck or various combinations thereof. These other transportation methods were discarded because analysis disclosed they resulted in increased transportation costs, and because they would not furnish the recreational and area development benefits that the waterway would provide. The statement also discloses that the alternative of 'no action' had been considered. This course was rejected because it would deny the savings in shipping costs, increased recreational opportunities, stimulation of economic growth, and the back-up contribution to national defense[21] that the waterway would provide.
 
 
 28
 The Corps raises two defenses against the plaintiffs' subsection (D) attack: first, that railroads are not an appropriate alternative to the waterway; and second, that subsection (D) requires the development of alternatives only where a project involves unresolved, detrimental environmental impacts. At the outset, we reject the second defense. Where, as here, the agency preparing the statement has been unable to assign weighted values to ecological considerations, it is hardly in a position to insist that it need not consider any alternatives since it 'finds' the environmental benefits of the project it proposes out-weigh its detriments. In any event, the congressional mandate to develop alternatives would be thwarted by ending the search for other possibilities at the first proposal which establishes an ecological plus, even if such a positive value could be demonstrated with some certainty.
 
 
 29
 The first defense is hampered by the testimony of the Corps' principal witness that its planners had not considered the railroad alternative in any detail. Although this testimony and the language of the statement demonstrate that the Corps' performance was no model for compliance with subsection (D), we find no sufficient basis in the record to disturb the court's factual conclusion that all appropriate alternatives had been duly considered. The mere fact that rail transportation was not 'developed' and that plaintiffs can suggest the possibility that rail traffic may have been appropriate is insufficient to overcome the court's finding. The plaintiffs made no attempt to demonstrate that the transportation function which the waterway proposed to provide-- low cost, slow, bulk movement-- is one which has been displaced, in whole or in part, by rail, highway, air or pipeline technology in any area wherein water carriage is available. The appropriateness of such a transportation scheme in the Tennessee-Tombigbee project area remains technically, economically, and ecologically speculative. Cf. Finish Allatoona's Interstate Right, Inc. v. Brinegar, 484 F.2d 638 (5th Cir. 1973).
 
 
 30
 The most important legal issue raised regarding Subsection 102(2)(C)[22] is the proper interpretation of the requirement that an environmental impact statement be 'detailed.' Obviously a statement must give more than a broad overview merely stating the location and height of a proposed dam or the beginning and ending points of a waterway project. But it is entirely unreasonable to think that Congress intended for an impact statement to document every particle of knowledge that an agency might compile in considering the proposed action.
 
 
 31
 The district court quoted from Natural Resources Defense Council, Inc. v. Morton, 148 U.S.App.D.C. 5, 458 F.2d 827 (1972), the requirement that an impact statement provide 'a basis for (a) evaluation of the benefits of the proposed project in light of its environmental risks, and (b) comparison of the net balance for the proposed project with the environmental risks presented by alternative courses of action.' The court also noted that the document was to be prepared in light of the knowledge that it was to be utilized both by the responsible agency and other decision makers. We agree. The detail required is that which is sufficient to enable those who did not have a part in its compilation to understand and consider meaningfully the factors involved. See Environmental Defense Fund v. Corps of Engineers, supra, 325 F.Supp. 749, at 759, and 342 F.Supp. at 1217. Our examination of the statement in the light of the testimony and the findings by the district court in the case at bar discloses no clear error in the court's conclusion that this statement was sufficiently detailed.
 
 
 32
 Plaintiffs complain that the statement omitted (1) a discussion of the effect of the anticipated population concentration in the area of the waterway, (2) any attempt at critical economic analysis, (3) significant archaeological and historical information, and (4) source references or other forms of scientific documentation.[23]
 
 
 33
 Plaintiffs are correct in asserting that the statement howhere deals with the effect of bringing additional people into the waterway area. A principal purpose of the project is to better the economic opportunities in this geographic area and population in-migration is anticipated. This precise objection was raised for the first time on appeal. The opinion of the court below does not specifically deal with it, and the record discloses that reference to the problem was made only in the most general way during the cross-examination of one of the defendants' witnesses. Plaintiffs had the burden not only to demonstrate that in-migration was a probable effect of constructing the waterway which had been omitted from the statement, but also that such a population shift would have a significant adverse environmental effect.[24] Both the lack of a record on this point and the lack of proof demonstrating that in-migration would have a significant adverse environmental outcome, constitute sufficient reasons for refusing to fault the impact statement for omitting any discussion of the result of new people moving into this underdeveloped area.
 
 
 34
 Plaintiffs contend that the impact statement was required to detail an analysis of the economics involved in the project or at least to give arguments supporting and opposing the various factors used in calculating that the benefits of the project exceeded is costs. The defendants respond by insisting NEPA requires no such detail. The unique conditions present here make it unnecessary for us to promulgate a principle for all seasons. Prior to NEPA, the economics of the Tennessee-Tombigbee project had been thoroughly developed and analyzed by the Corps and ultimately weighed by Congress, which determined that the project was economically feasible. After the enactment of NEPA and after the Corps had filed its environmental impact statement, Congressional debate expressly included consideration of combined economic and environmental costs and benefits of the project. The record of this debate, which we discuss more fully in the succeeding section, indicates a congressional awareness of the previously determined economic costs and benefits of the project and a reevaluation of them in light of the environmental considerations which NEPA requires be added to the decision making crucible. Since we have previously held that NEPA does not require specific assignment of values to environmental factors, Congress had before it all NEPA requires in making its decision. In the context of the two-phased Congressional approval of this particular phase of the project, it would be overly formalistic for us to fault the failure to detail an economic analysis in the impact statement.
 
 
 35
 The statement's coverage of the archaeological, historical, and geological impact of the project was dealt with in detail by the court below. Its findings are not clearly erroneous. Plaintiffs point out that there was no listing of sites worthy of nomination for inclusion within the National Register of Historic places, nor was any reference made to the only archaeological study available. We do not consider either of these contentions to raise significant omissions. The National Hostorical Sites Act[25] is a specific act that controls over the more general applicability of NEPA to matters of historical significance. The Historical Sites Act did not require the Corps to make any listing of sites that were not presently included out could be nominees for the register maintained by the National Parks Service. The particular archaeological survey, which plaintiffs contend was the most worthwhile document available, was before the court below as an exhibit. It was well within the ambit of that court's fact finding prerogative to determine that it disclosed no significant information which required its express inclusion in the impact statement as prepared.
 
 
 36
 The failure of the environmental impact statement to make express reference to significant source materials upon which the Corps' team relied did not breach any statutory mandate or then existing CEQ guidelines.[26] The statement did contain a section on coordination with other government agencies that was comprised of a synopsis of significant comments by other public agencies, and copies of the letter responses of such agencies were attached. Members of the Corps' team testified they concluded that the inclusion of references to the substantial number of documents read and considered would make the resulting document less readable. Plaintiffs offered no proof that they were unable to pursue any scientific or technical subject because of the lack of documentary reference, or that conflicts between authorities in a particular field required an indication of which line had been followed. Since the CEQ has now recommended that statements indicate source materials, the proper construction of statements prepared subsequent to this recommendation must take this into account; but, on the basis of the record now before us, we affirm the district court's decision that this statement was sufficiently detailed without the inclusion of such references.
 
 
 37
 Plaintiffs also contend that the Corps did not comply with the Fish and Wildlife Coordination Act of 1934, 16 U.S.C. 662(b) (1970). The argument is that, because this statute required that a report and recommendation of the Secretary of the Interior be obtained and submitted to Congress, cabinet level action was mandatory. The Corps' consultation with officials of the Department of the Interior is asserted to be insufficient in law on the basis that the requirements of Section 662(b) cannot be delegated by the Secretary of the Interior.
 
 
 38
 The short answer to this contention is that under Section 2 of Reorganization Plan No. 3 of 1950, 64 Stat. 1262, the Secretary of the Interior may 'make such provisions as he shall deem appropriate authorizing the performance by any other officer, or by any agency or employee of the Department of the Interior of any function of the Secretary.' This plan, which consolidated all duties in the Secretary, clearly authorizes him to allocate his functions under the Fish and Wildlife Coordination Act to subordinates in the Department.
 
 
 39
 Judicial Review of the Substantive Determination to Proceed
 
 
 40
 The district court ruled that 'courts do not sit to decide the substantive merits or demerits of a federal undertaking under NEPA, but only to make certain that the responsible federal agency, in this case the Corps of Engineers, makes full disclosure of environmental consequences to the decisionmakers,' 348 F.Supp. at 925, and abjured the role of deciding whether the waterway would be an economic and environmental disaster or a social, recreational and commercial boon to a deprived area. This position was based upon what the court correctly perceived to be the then prevailing rule. Today, the law has assumed a different posture.
 
 
 41
 Appellants assert that jurisdiction for court review of the merits of the Corps' ultimate decision to proceed with this project is found in the Administrative Procedure Act (APA),[27] which provides that actions of government agencies are subject to judicial review except where 'statutes preclude judicial review' (an exception not relevant here) or where 'agency action is committed to agency discretion by law.' The Supreme Court has indicated that this agency discretion exception is a very narrow one, 'applicable in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 410, 91 S.Ct. 814, 820-821, 28 L.Ed.2d 136 (1971). The preliminary question here then is whether Section 101 of NEPA (together with Section 102(1)) provides 'law to apply' standards governing the substance of the agency decision to recommend a major federal action which can guide the judicial reweighing that plaintiffs seek.
 
 
 42
 Courts that have discussed, either decisionally or in dicta, whether APA review extends to the merits of the agency's final decision have reached varying results. To date the Fourth, Eighth, and District of Columbia Circuits find that NEPA does establish substantive 'law to apply.' Conservation Council v. Froehlke, 473 F.2d 664, 665 (4th Cir. 1973); Environmental Defense Fund v. Corps of Engineers, 470 F.2d 289, 298 (8th Cir. 1972),[28] and Calvert Cliffs' Coordinating Comm. v. Atomic Energy Commission, 146 U.S.App.D.C. 33, 449 F.2d 1109, 115 (1971).[29] The Ninth and Tenth Circuits discern only procedural requirements. Environmental Defense Fund, Inc. v. Armstrong, 487 F.2d 814 (9th Cir. 1973);[30] National Helium Corp. v. Morton, 455 F.2d 650, 656 (10th Cir. 1971).[31] The Second Circuit has not dealt directly with this issue. See Scenic Hudson Preservation Conf. v. F.P.C., 453 F.2d 463, 481 (2d Cir. 1971), cert. denied, 407 U.S. 926, 92 S.Ct. 2453, 32 L.Ed.2d 813 (1973).[32] Despite dicta in two prior decisions of this court, Save Our Ten Acres v. Kreger, 472 F.2d 463, 467 (5th Cir. 1973), which indicated Civic Club, Inc. v. Lynn, 476 F.2d 421, 425 (5th Cir. 1973), which indicated that substantive agency decisions under NEPA are not reviewable, the majority and better reasoned rule favors such review. We therefore hold that the broad and general provisions of Section 101 do delineate sufficiently definite standards to permit a meaningful, albeit limited, review;[33] and that an agency's ecological decisions under NEPA are not beyond APA scrutiny.
 
 
 43
 Appellants urge that the trial judge's legal ruling doubly prejudiced their rights, because he not only refused to review the Corps' decision to proceed but also ruled out their tender of evidence which assertedly would have shown that (1) an arbitrarily low interest rate had been used to amortize dollar costs, (2) false assumptions had been included in the ecological-economic analysis, and (3) the Corps' weighting of various ecological values was arbitrary and capricious. The exclusion of proof we hold now to be relevant, would ordinarily require reversal to permit its development. But as the facts developed below demonstrate, this case cannot be cast in ordinary mold.
 
 
 44
 The Administrative Procedure Act is, as its name implies, directed to agency action. The Act expressly excludes any grant of a right to judicial review of Congressional decisions.[34] The question then becomes; Who made the final ecological-economic decision that caused the construction of this waterway to proceed-- the Corps or Congress? If it was the Corps, then the matter must go back for further fact development. If it was the Congress, then no additional judicial consideration of the wisdom of that decision would be appropriate. Clearly, the Corps compiled the facts and produced the environmental impact statement. Clearly too, the Corps concluded its study and report with the recommendation that the project be constructed. Had the matter ended there, the answer would be obvious-- the Corps' decision was the final word. But this is not where the matter was intended to end, nor is it where it actually stopped.
 
 
 45
 Environmental impact statements are not confidential or internal documents for agency eyes alone. This court observed in Save Our Ten Acres v. Kreger, supra, 'NEPA was intended not only to insure that the appropriate responsible official considered the environmental effects of the project, but also to provide Congress (and others receiving such recommendation or proposal) with a sound basis for evaluating the environmental aspects of the particular project or program.' 472 F.2d at 466. As we have previously observed, when NEPA was enacted all previous Corps actions and recommendations related to the waterway were shelved, and a new study was undertaken. After a long and careful trial, the court below found this study to be sufficient procedurally. It eventuated in an environmental impact statement which likewise was found to comply with NEPA Section 102 requirements. That statement was duly delivered to the Congress. With the Corps' Tennessee-Tombigbee impact statement before it, the details of detriments and benefits of the project were extensively discussed, the three-part method used by the Corps to comply with the Act was thoroughly aired, and Congress determined that the waterway should be built.[35] Congress thus became the ultimate decisionmaker. The Congressional Record clearly shows that this decision was made by Congress upon the sound basis for environmental evaluation which NEPA intended to provide.
 
 
 46
 Several courts have indicated that legislative appropriations should not be construed to constitute an implied repeal of the duties imposed on agencies by NEPA and, therefore, do not preclude judicial review of the procedural sufficiency of such impact statements. Environmental Defense Fund, Inc. v. Froehlke, supra; Comm. for Nuclear Responsibility, Inc. v. Seaborg, supra; Environmental Defense Fund v. Tennessee Valley Authority, 468 F.2d 1164 (6th Cir. 1972); Ohio v. Callaway, 364 F.Supp. 296 (S.D.Ohio 1973), and Environmental Defense Fund v. Corps of Engineers, supra, 325 F.Supp. at 762. However, these authorities do not speak to the circumstances of this case. The procedural sufficiency of the environmental impact statement to comply with the Section 102 duties placed upon the Corps has been fully and properly entertained by the court below. Both that court, and now this court, have concluded that the impact statement met the requirements of the Act. It gave Congress the factual background and information contemplated by NEPA so that Congress could make the final decision that construction of the Tennessee-Tombigbee Waterway should proceed. This informed and deliberate legislative action, while not barring court review for procedural compliance, nevertheless effectively supplants the Corps' recommendation that the project be built. Hence, even severely circumscribed judicial review is both inapposite and unnecessary.
 
 Conclusion
 
 47
 It would be a mistake to attribute any broad significance to the factual resolutions affirmed here. The project involved is unique in many ways. It has been under consideration for more than one hundred years. The agency recommended its construction before NEPA became law, and Congress approved and funded its construction both before and after it enacted NEPA. The significance of the post NEPA legislative action is greatly enhanced by the fact that the procedural and substantive sufficiency of this very impact statement was extensively debated. The pre and post NEPA economics of the waterway have been the subject of detailed legislative consideration. While the Corps' study and statement does have slight imperfections, the breadth and depth of the effort made evidenced sincerity and good faith objectivity. We find no error in the district court's conclusion that plaintiffs failed to demonstrate that no material consideration that would have been of significance to congressional appraisal of the ecological or economic considerations involved was omitted. Given this background and the depth of the trial court's careful and complete review, we
 
 
 48
 Affirm.
 
 
 
 [1]
 42 U.S.C. 4331 et seq
 
 
 [2]
 5 U.S.C. 701 et seq
 
 
 [3]
 For a thorough discussion of the history of the waterway through 1970, see W. Stewart, The Tennessee-Tombigbee Waterway: A Case Study in the Politics of Water Transportation (U. of Ala.1971)
 
 
 [4]
 In 1962, the Corps determined the benefit-to-cost ratio of the project to be 1.08 to 1, calculated on the basis of a 2 5/8% Discount rate. In 1966, the ratio had risen to 1.24 to 1, based on a 3 1/8% Interest rate. The most recent economic study, filed in July 19708 determined the benefit-to-cost ratio to be 1.6 to 1, based on a 50 year project life and a 3 1/4% Interest rate. See 348 F.Supp. at 923-924
 
 
 [5]
 NEPA 202, 42 U.S.C. 4342
 
 
 [6]
 See 117 Cong.Rec. 28483-28487 (1971). The effect of this extended discussion on judicial review of the ultimate decision to proceed with the construction of the waterway is considered further in the final section of this opinion
 
 
 [7]
 It is appropriate to note that the parties raise no issue as to NEPA's applicability to this project even though when NEPA was enacted the waterway was well past the design stage. Before any litigation was instituted, the Corps began efforts to comply with the Act as it would apply to the Tennessee-Tombigbee waterway. With the hindsight benefit of our decision in Zabel v. Tabb, 430 F.2d 199 (5 Cir. 1970), we can see that the Corps was clearly correct in giving a retroactive interpretation to this legislation. Zabel applied NEPA to a licensing decision by the Corps which had been finalized well before NEPA's effective date. See also, Note: Retroactive Application of the Nation's Environmental Protection Act of 1969, 69 Mich.L.Rev. 732 (1971)
 
 
 [8]
 See also Life of the Land v. Brinegar, 485 F.2d 460, 467 (9th Cir. 1973)
 
 
 [9]
 In one letter the writer stated that in addition to preparing the NEPA impact statement:
 We will make a comprehensive and detailed environmental study in which we will evaluate more precisely, from the ecological standpoint, the changes, the gains and losses, and the new opportunities that will result from the project. These findings will be reflected in appropriate design changes and project modifications to increase the gains, decrease and mitigate the losses, and exploit the new opportunities.
 In a later letter he wrote:
 Based on our present knowledge of the Waterway and its probable beneficial and adverse environmental effects, we consider that construction of early elements of a project could be prudently initiated prior to completion of the entire environmental study . . .. The environmental study will be structured so that early findings could be reflected in appropriate modifications of the Gainesville portion as construction progresses. Apart from this, no other elements of the Waterway would be placed under construction prior to essential completion of the environmental study, so that whatever project changes were deemed necessary could be made before proceeding further.
 
 
 [10]
 This was the explauation of the Corps' concept which he gave:
 I believe that those who are clamoring for preconstruction completion of all three phases of the Tenn-Tom environmental study have a basic misunderstanding of the three-part study by the Government. The first phase of the study, which has been completed, was a thorough environmental research program which investigated the effects of the proposed project and concluded that there would be no detrimental effects serious enough to warrant foregoing development of the project, and moreover the project could be implemented in such a way that the over-all environment of the area would actually be benefitted. During this phase, a detailed environmental statement was filed with the Council on Environmental Quality. The second phase of the environmental study, now under way, was planned to be executed as designing of the waterway progressed. This phase consists of sustained environmental research which will allow the Corp to make ecologically desirable design changes and project modifications. The final phase of the environmental study is planned to be implemented as project construction proceeds and after actual operations begin.
 The main point I wish to make in answer to those who feel that all three phases of the environmental study should be completed before a proper evaluation of the project can be made is that phase I of the study has provided comprehensive data sufficient to show that the project can be economically and ecologically desirable. Phases II and III of the study-- to be executed as design, construction and operation proceed-- are merely parts of a continued effort to assure that the project will be implemented in a way most compatible with the natural environment of the area.
 
 
 [117]
 Cong.Rec. 28484 (1971)
 
 
 [11]
 The full text of the subsections of 102 which are most significant here, are set out in notes to the specific discussions of those sections. See notes 15, 19 and 22, infra
 
 
 [12]
 H.R.Rep.No. 91-765, 91st Cong., 1st Sess. 9-10 (1960), U.S.Code Cong. & Admin.News 1969, p. 2751
 
 
 [13]
 The term 'action forcing' is attributed to the principal sponsor of NEPA, Senator Jackson. This apt description of the provisions of Section 102 has been widely adopted by the courts to indicate those requirements of the NEPA which affirmatively call for studies, consultation, reports and statements by federal agencies administering projects or programs which may have a significant impact on the environment. See, e.g., Calvert Cliffs' Coordinating Comm. v. Atomic Energy Commission, supra, 449 F.2d at 1113
 
 
 [14]
 Plaintiffs emphasize that Section 102(2)(D) differs from subsection 102(2)(C)(iii), which merely requires that the environmental impact statement include 'alternatives to the proposed action' because it commands study and development when a proposed action involves 'unresolved conflicts concerning alternatives uses of available resources'. More concerning this distinction is set out below in the specific discussion of Section 102(2)(D)
 
 
 [15]
 Section 102(2)(B) provides:
 (B) identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by subchapter II of this chapter, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decision making along with economic and technical considerations.
 
 
 [16]
 The district court combined its discussion of the meaning of subsection (B) and subsection (A), which requires the use of a 'systematic, interdisciplinary approach.' See 348 F.Supp. at 927-931. In that process, the court distilled from subsection (B) an intent to lend methodology to the broad, systems approach required by (A). As a result, the interplay between the two subsections was held to require the use of a method which was reasonably calculated to result in objective evaluation of the total environmental impact in deciding the 'full cost' of the federal action. The emphasis on methodology as a primary purpose of this subsection was drawn from congressional history. See 348 F.Supp. at 928, n. 18. The district court concluded that the Corps' decision to use the interdisciplinary team method in the manner it was actually employed was a sufficient compliance with subsections (A) and (B). The district court also found that plaintiffs failed to demonstrate that the scientific data and literature compiled by the Corps did not provide an adequate bases for assessment of the environmental impact. Thus, the court was convinced that no violation of the letter or spirit of these subsections were shown
 
 
 [17]
 In pertinent part this statute provides:
 . . . the Federal Government should improve . . . navigable waters . . . for flood-control purposes if the benefits . . . are in excess of the estimated costs, and if the lives and social security of the people are otherwise adversely affected.
 
 
 [18]
 We have noted the discussion in Part III of Montgomery v. Ellis, 364 F.Supp. 517 (N.D.Ala.1973). While the subsequent section of this opinion demonstrates our agreement with that district court's analysis as to the extent of judicial review available under NEPA, we need not reach the validity of using a comparable interest factor in this case. As explained below, Congressional action has displaced the necessity and propriety of court review of the cost and interest factors used
 
 
 [19]
 Section 102(2)(D) provides:
 (D) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources;
 
 
 [20]
 See note 22, infra
 
 
 [21]
 In Senate debate it was also brought out that the project could effect a substantial savings for waterway traffic-- not only within in the Tennessee-Tombigbee system but also on the Mississippi River-- by providing a fuel-saving, slack water route for upbound barges. 117 Cong.Rec. 28487 (1971), Remarks of Senator Allen
 
 
 [22]
 The pertinent part of Section 102(2)(C) provides:
 (C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on--
 (i) the environmental impact of the proposed action,
 (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
 (iii) alternatives to the proposed action,
 (iv) the relationship between local short-term uses of man's environment and the maintenance and enchancement of long-term productivity, and
 (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented. Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes.
 
 
 [23]
 The charge is also made that the Corps was guilty of a misstatement in saying that no rare or endangered species would be affected by the waterway. This claim is based upon a single observation from the district court's opinion which is taken out of context. Correctly read, it is no more than a paraphrase of one of plaintiffs' contentions. Plaintiffs are also critical of the statement's failure to presently consider matters which the Corps acknowledges will be left for future study. These matters include an improved method of disposing of the soil displaced by the project, the total effect of mixing the fish life of the Tennessee and the Tombigbee River systems, and the pollution resulting from anticipated water traffic. There can be no doubt that each of these future studies can develop important ecological results. However, neither the absence of these results from the statement nor the determination to study these matters in the future mandates reversal since the sufficiency of the statement has been judged solely on what it contained and not what it promised
 
 
 [24]
 'Probable' and 'significant' are the standards set out in the CEQ guidelines. 35 Fed.Reg. 7390 (April 1970)
 
 
 [25]
 16 U.S.C. 461 et seq
 
 
 [26]
 Plaintiffs refer to a post-statement CEQ memorandum, 2 E.L.R. 46162, 46164, which recommended that statements indicate source materials
 
 
 [27]
 5 U.S.C. 701 et seq
 
 
 [28]
 See also Environmental Defense Fund v. Froehlke, 473 F.2d 346 (8th Cir. 1972)
 
 
 [29]
 Cf. Comm. for Nuclear Responsibility, Inc. v. Seaborg, 149 U.S.App.D.C. 380, 463 F.2d 783 (1971)
 
 
 [30]
 See also Jicarilla Apache Tribe of Indians v. Morton, 471 F.2d 1275 (9th Cir. 1973)
 
 
 [31]
 See also Upper Pecos Ass'n v. Stans, 452 F.2d 1233, 1236 (10th Cir. 1971), cert. granted, 406 U.S. 944, 92 S.Ct. 2040, 32 L.Ed.2d 330 (1972), vacated and remanded to determine mootness, 409 U.S. 1021, 93 S.Ct. 458, 34 L.Ed.2d 313 (1972)
 
 
 [32]
 This issue has been the subject of an extensive discussion in a recent case note. Substantive Review Under the National Environmental Policy Act: EDF v. Corps of Engineers, 3 Ecology L.Q. 173 (1973)
 
 
 [33]
 Courts which have discussed the scope of judicial review accorded to agency acts of procedural compliance vis-a-vis substantive decision making have developed a bright line distinction between the two. Whereas, the rather precise directions of Section 102 lend themselves to full court consideration; determination of the point where the final balance to act or withhold action is so broadly committed to quasi-legislative agency action that court review is exceedingly narrow
 Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.
 Citizens to Preserve Overton Park v. Volpe, supra, 401 U.S. at 416, 91 S.Ct. at 824.
 The general substantive policy of the Act is a flexible one. It leaves room for a responsible exercise of discretion and may not require particular substantive results in particular problematic instances.
 Calvert Cliffs' Coord. Comm. v. A.E.C., supra, 449 F.2d at 1112.
 The Act does does not require that a particular decision be reached but only that all factors be fully explored. The eventual decision still remains the duty of the responsible agency.
 Scenic Hudson Preservation Conf. v. F.P.C., supra, 453 F.2d at 481.
 
 
 [34]
 The term 'agency' 'means each authority of the Government of the United States . . . but does not include-- (A) the Congress . . ..' 5 U.S.C. 701
 
 
 [35]
 See 117 Cong.Rec. 28478-28488 (1971). Senator Allen concluded the debate with this statement
 After more than 100 years of waiting, the project is now getting underway, thanks to the recommendations of the President and action of Congress.
 
 
 [117]
 Cong.Rec. at 28487