# TEXAS COMMITTEE ON NATURAL RESOURCES

#### v.

**Bob BERGLAND, Secretary of Agriculture of the United States, John R. McGuire, Chief, Forest Service of Department of Agriculture, John Courtenay, Forest Supervisor, Sam Houston National Forest, Forest Service of the Department of Agriculture, Individually and in their official capacity.**

Civ. A. No. TY–76–268–CA.

United States District Court,
E. D. Texas,
Tyler Division.

May 24, 1977.

---

Roby Hadden, U. S. Atty., E. D. Tex., C. Houston Abel, Asst. U. S. Atty., Tyler, Tex., L. Mark Wine, Atty. Dept. of Justice, Land and Natural Resources Div., Washington, D. C., for defendants.

James R. Cornelius, Jr., Kenzie D. Hallmark, Zeleskey, Cornelius, Rogers, Berry & Hallmark, Lufkin, Tex., for defendant-intervenors A. A. Steely Lumber Co., et al.

James G. Ulmer, Baker & Botts, Houston, Tex., for defendant-intervenor Texas Forestry Ass'n.

William H. Kugle, Jr., Athens, Tex., Henry T. Skelton, Jr., Athens, Tex., Edward C. Fritz, Dallas, Tex., for plaintiff.

## FINDINGS OF FACT

JUSTICE, District Judge.

1. Plaintiff in this civil action is the Texas Committee on Natural Resources, a voluntary organization supported by contributions from individual members. Various members of the plaintiff committee make use of the National Forests in Texas for recreational purposes.

2. The defendants include Bob Bergland, Secretary of Agriculture (who is automatically substituted as a defendant pursuant to Fed.R.Civ.P. 25(d) ), John McGuire,

Chief, Forest Service, Department of Agriculture, and John Courtenay, Forest Supervisor, National Forests in Texas, who are responsible for management of the National Forests in Texas.

3. Intervenors in this action are the Texas Forestry Association; Oliver Brothers Lumber Co., Inc.; Champion International Inc.; Conroe Creosoting Co.; L. R. Davis; Leggett Lumber Co., Inc.; Louisiana-Pacific Corp.; Owens Illinois, Inc.; Southland Paper Mills, Inc.; Walker Brothers, Inc.; Williams Lumber Co., Inc.; Woodville Lumber Co.; A. A. Steely Lumber Co.; The Boettcher Land and Timber Co.; Giles Brothers Lumber Co.; Davis Pulpwood Co.; Bob Currie; and Jack Alexander, Inc.

4. The United States Forest Service manages approximately 662,313 acres of National Forest lands in East Texas, with headquarters in Lufkin, Angelina County, Texas. The National Forests in Texas are comprised of four separate forests, namely, the Sam Houston, Angelina, Sabine, and Davy Crockett National Forests.* They are administered by a single employee, known as a Forest Supervisor, through seven Ranger Districts, each headed by a Forest Service employee known as a District Ranger. The seven Ranger Districts are: Raven, San Jacinto, Yellowpine, Trinity, Neches, Angelina, and Tenaha.

5. Of the total of 662,313 acres in the National Forests of Texas, 50,251 acres are under water, 30,570 acres are reserved or protected, and 22,500 acres are for various reasons unavailable for timber management activities. Thus, a total of approximately 558,992 acres is left available for timber management purposes.

6. "Uneven-age management" is a forest management system which provides for an intermingling of trees ranging in age from seedlings or sprouts through maturity; thus, a full range of age classes is found on each acre of a stand. Only the largest, oldest, and dead trees are harvested at annual or more frequent intervals. This is known as "selective harvesting".

7. Until 1964, the Service practiced selective harvesting of pines and hardwoods in Texas. Its foresters marked the dead, mature, and large trees for sale to private purchasers, who removed only those trees, leaving the younger trees to grow.

8. "Even-age management" is a forest management system wherein a stand of timber (softwoods or hardwoods or a mixture) of uniformly-aged trees is cultivated and maintained through maturity. Trees in an even-age stand are generally of the same age, but not necessarily of the same size. As hereafter shown, harvest schedules include two or three intermediate thinnings, conducted at fifteen to twenty year intervals, with the final regeneration harvest method being clearcut, shelterwood, or seed tree.

9. In Texas, the United States Forest Service shifted its system of management and sales (other than "thinning sales") to clearcutting, including seed tree cutting, in 1964. Since then, this method has accounted for the large majority of all sawlog sales by the Service. Under this method, the Service selects "units" in which the merchantable pine types (and, in less than ten percent of the acreage, hardwood types) are marked for harvesting.

10. Each sale of timber from the National Forests is consummated through a formal sale contract. These sales of timber are conducted according to regulations issued by the Secretary of Agriculture, 36 CFR 221, and are in accordance with procedures and guidelines contained in the Forest Service Manual, a large compilation of guidelines, directives, and other information governing the internal operations of the Forest Service.

11. District Rangers are named as contract officers. Sale operations are inspected, on a current basis, by specially trained sale administration officers working for the District Ranger.

---

* See map attached hereto entitled "The East Texas Forests", taken from R. PHELAN, TEX-AS WILD 146 (1976) and reproduced with permission of the author.

12. The Service advertises various units for bids by prospective purchasers, indicating its prescription of "clearcut", "seed tree cut", or "seed tree removal" on the Sale Area Map, an attachment to the Timber Sale Prospectus. Each contract has a life of one to three years, which is extendable.

13. Contract provisions require some specific measures of environmental protection in timber cutting, utilization, and removal. Thus, timber sale contracts contain such standard clauses as "CT 6.4—*Conduct of Logging*", which provides that logging will be conducted only with animals, trucks, or rubber-tired tractors with a gross weight of 13,000 pounds or less, or a bulldozer of up to 15,000 pounds (without bulldozer blade). "CT 8.2-*Environmental Protection*" provides for sale termination upon determination of environmental damage. However, such contracts contain no provisions requiring the purchaser to protect or to spare the unmarked trees, or to pay for them in the event of damage or felling (except that certain trees and buffer zones are reserved as locations where red-cockaded woodpeckers have nesting holes).

14. The contracts generally include a requirement that the purchaser construct one or more roads from an existing road to the area of the newly sold timber. The contracts also contain penalties, including provisions for breach and cancellation.

15. Within the contractual period, the purchaser moves in heavy equipment and cuts and removes the marked trees, leaving the other trees and vegetation heavily damaged.

16. The harvesting operation is then completed by the Service. On most harvesting sites, the Service "clearcuts", using heavy equipment to slice or push down, to within two or three inches of the ground, any trees and vegetation remaining after the commercial cutting. At that point, the debris is either piled and burned or pushed into windrows. In some harvesting sites, the Service uses herbicides, in addition to heavy equipment, to kill the vegetation remaining after the commercial cutting. Generally, the action of the Service results in the conversion of the harvest site to a bare field.

17. After the clearcutting, the Service plants seeds or seedlings, generally slash, loblolly, or shortleaf pine. In clearcuts where hardwoods have prevailed, they are permitted to grow back from those roots which were not destroyed by the clearcutting equipment. This process is called "regeneration".

18. About seven to fifteen years after each regeneration, the Service "clears out" hardwoods, by such processes as "prescribed burning" or herbicide injection. Later, the Service marks some of the remaining young trees for a thinning sale. Following the marking, the purchaser fells and removes the marked trees by use of heavy equipment. This process may be repeated up to four times in the life of the stand. The remaining trees are subjected to additional prescribed burning, to eliminate hardwoods and understory vegetation. The Service plans that, at the end of the rotation, the remaining large trees, mostly pines, will be marked for sale and sold as sawlogs.

19. Once the clearcutting cycle is underway, it comes under the Service terminology of "even-age management."

20. As part of the current clearcut sequence, the Service now plans the following rotation periods: seventy years for loblolly pine, eighty years for shortleaf pine, and one hundred years for hardwoods.

21. Defendants intend to continue this process of clearcut-regeneration until 524,-281 acres of the commercial forest lands in the four National Forests are converted to pine and 23,177 acres to hardwoods. This proposal constitutes a major federal action, the cumulative or synergistic effects of which are likely significantly to affect the quality of the human environment in the East Texas region.

22. Under the clearcut sales contracts previously described, the Service and the purchasers and contractors, in combination (including all Intervenors except Texas Forestry Association), are mutually engaged in clearcutting in the National Forests of Tex-

as, each performing an integral part of that operation.

23. The clearcutting of the National Forests in Texas is highly controversial; *i. e.*, a substantial dispute exists as to the environmental effects of even-age management.

24. Stands which the Service clearcut from 1964 to 1975 are now covered densely with pine trees ten to twenty feet in height, except for openings among the pines, where the main growth is in briars, sumac, sweetgum, and other species of low value for timber or for game. After clearing and thinning, these stands become virtual monocultures of the loblolly, shortleaf, or slash pine species, with the exception of some hardwood "stringers" that are located primarily, but not wholly, in the lowlands.

25. Clearcutting results in increased fire hazard, because fire hazard is a function of fuel moisture content. In a forest, the flammable material on the ground is relatively moist and slow to burn, because of shade from the tall trees and the moisture of transpiration held under the forest canopy, where air is less free to move than where there is no forest. When all the trees are removed over an extensive area, flammable material will be hotter and drier than under a forest canopy and will, therefore, burn more readily.

26. Clearcutting probably results in increased hazard from insects and diseases, because it creates stands of trees of the same age and frequently of the same species, and because most insects and diseases attack trees of a particular age or species. (It is theorized by respectable authority that the closer a stand approaches a monoculture, the more susceptible it is to attack by insects and disease, and the more likely it is that an attack will become epidemic.)

27. Clearcutting impairs the productivity of the land, because it causes accelerated erosion and loss of the all-important top soil. Erosion increases exponentially with increase in the size of openings created in the forest by logging, and with the proportion of timber cut.

28. Clearcutting impairs the productivity of the land, because it causes leaching of nutrients essential to tree growth.

29. Clearcutting impairs and reduces the amount of habitat essential to various species of wildlife. Some species require relatively mature trees for nesting and for food. Other species require dead or hollow trees for nesting. Still other species of wildlife require a combination of mature hardwood trees for acorns, nuts, and other mast, and young hardwoods for browse. As detailed above, clearcutting results in closed even-age stands a few years after regeneration, and these stands provide inferior food and shelter for such particular species of wildlife.

30. Clearcutting impairs the productivity of the land by reducing the number of species and, therefore, eliminating the wide range of benefits resulting from the subtle interdependencies characteristic of the natural forest.

31. Except for birdwatching, photography, and some forms of hunting, even-age management largely destroys the recreational values of the clearcut area for about thirty years.

32. Even-age management results in the liquidation of high quality timber while it is still in the period of greatest volume growth, which inevitably leads to a future scarcity of high quality wood.

33. The Forest Service Manual, Sections 2403.1 and 2471, requires that "methods of cutting and logging will preserve the residual living and growing timber, promote favorable conditions of waterflow . . .". Contrary to the Manual, even-age management, as practiced in the National Forests of Texas, does not promote the younger growth. Further, clearcutting, as practiced in the National Forests of Texas, does not preserve the residual and growing timber, reduce hazards of destructive agents, nor secure favorable conditions of waterflow, but produces contrary effects.

34. As practiced in the National Forests of Texas, clearcutting also damages the trunks, branches, and often the roots of

living hardwood trees which are not yet large or physiologically mature (even though they are up to seventy and eighty years of age) but are, instead, classified as younger growth. It thereby prevents or seriously sets back such younger growth, and often causes its death.

35. Although proscribed from doing so by its Guidelines, the Service has clearcut on soils and slopes which are fragile and subject to major injury. The Service has adopted this course of action, because it assumes that clearcutting will give the greatest short-range dollar returns and the greatest unit output.

36. Further, in the National Forests of Texas, the Service follows the practice of selling timber to the very banks of creeks. This practice results in increased erosion of the banks and increased siltation of creeks. As to Briar Creek in the Raven District, and likewise as to other streams, cutting to the edge will, in reasonable probability, severely impair or ruin the streams for recreation, fish, wildlife, and soil and water conservation purposes.

37. A minimum buffer zone of natural vegetation along each side of a stream necessary to protect the stream, whether permanent or intermittent, is sixty-six feet.

38. During the last ten year period, the sawtimber sales in the National Forests of Texas were 628.6 million board feet. The sawtimber growth for that period was 2,017.0 million board feet. The pulpwood sales were 259.2 million board feet, and the pulpwood growth was 997.0 million board feet. Less than one-third of the growth was harvested.

39. The annual regeneration in the National Forests in Texas over the last three years has been approximately 5,500 acres. On a percentage basis, approximately 0.98% of all land available for timber management purposes is regenerated annually.

40. On March 2, 1976, pursuant to the Forest and Rangeland Renewable Resources Planning Act of 1974 (16 U.S.C. §§ 1601–1610), the Forest Service filed with the Council on Environmental Quality a document entitled, on its cover, "RPA, A Recommended Renewable Resource Program" (hereinafter called "RPA"). The inside title page recites, "Final Environmental Statement and Renewable Resource Program, 1977 to 2020." The document of 800 pages is mainly a recitation of background and goals under the Forest and Rangeland Renewable Resources Planning Act of 1974. However, on pages 350–97, the section "Environmental Analysis" includes headings often contained in environmental impact statements. Within this section is a three-page "Analysis of Cutting Alternatives" (pp. 386–88), inserted after the "Monogahela" decision (*West Virginia Division of Izaak Walton League of America v. Butz*, 522 F.2d 945 (4th Cir. 1975)).

41. While the renewable resources environmental analysis does not specifically address management activities in Texas, it does discuss the effects of timber harvest on soil productivity, water quality, water yield, air quality, vegetation, wildlife, forage, fisheries, aesthetics, social well-being, quality of life, and civil rights in the various National Forests. The environmental analysis also discusses reforestation and timber stand improvement aspects of timber management. Furthermore, certain unavoidable adverse environmental impacts, the relationship between local short term uses of the environment versus long-term productivity, irreversible and irretrievable commitment of resources, and other matters are also treated.

42. Insofar as the National Forests of Texas are concerned, RPA is inadequate in the following aspects:

a. It fails to discuss the National Forest Service proposal of clearcutting and converting a major portion of the federal forests in Texas mainly to a single species.

b. It fails to discuss the long-range effects of clearcutting over one or more entire rotations.

c. It fails to discuss the effects of clearcutting on individual species of plants, other than trees.

d. It fails to discuss the effects of clearcutting on individual species of animals, except for conflicting statements about deer and fisheries.

e. It fails adequately to compare the effects of clearcutting and selective harvesting, in order that the decision-maker could make an informed and rational choice; likewise, it does not allow those who are not a part of the decision-making process adequately to evaluate and balance the various factors on their own. The RPA merely states the conclusion that selective harvesting will reduce timber production.

f. It fails to give authoritative statistics in support of many of its conclusions, including its contradictory conclusions that selective harvesting would reduce timber production by "5% to 20%" (p. 363), "30%" (p. 364), and "90%" (p. 387).

g. It fails to discuss the differences in quality between the large hardwoods killed in clearcutting and the sometimes diseased and damaged sprouts which come back from the roots after clearcutting.

h. It fails to discuss the effect of clearcutting on the original ecosystem, and the resultant losses of resources for science, medicine, organized education, and unorganized nature study.

i. It fails adequately to discuss the effects of clearcutting and pine regeneration on recreation. On this topic, RPA does not make reference to such forms of recreation as walking, camping, bird-watching, photographing, or hunting.

j. It fails to discuss the effect of clearcutting on the water table.

43. Prior to authorizing timber sales in the National Forests of Texas and elsewhere, the Forest Service performs an interdisciplinary review by wildlife biologists, soil scientists, and other specialists. This review is made approximately three years prior to sale. Another review is conducted immediately prior to the formulation of the yearly action plan, to assure that action is based on the current situation and guidelines.

44. The Forest Supervisor's staff includes expert wildlife biologists, soil scientists, hydrologists, landscape architects, engineers, foresters, and other specialists who participate in making management decisions. These specialists on the Forest Supervisor's staff work in a number of ways, including on-the-ground resource inventorying, consultation with other Forest Service personnel in timber management planning and compartment prescription review, and preparation of environmental analysis reports and environmental impact statements. Timber harvest proposals are sometimes modified by these specialists, in attempting to conform to and balance other resource requirements and in seeking to avoid major environmental impacts.

45. Based on an environmental analysis, the Forest Service makes a determination as to whether an environmental impact statement will be prepared on a given action. The environmental analysis is developed by an interdisciplinary team.

46. An environmental analysis results in either a negative declaration (i. e., a declaration that an environmental impact statement is not required), a modification of the proposed action and then a negative declaration, or a decision to prepare an environmental impact statement. Negative determinations are reversible, should controversy or other later events require an environmental statement to be written. Environmental analyses are developed for a variety of actions, such as special use permits, prescribed burning activities, compartment prescription, recreation, parking lots, roads, and other management activities.

47. Based on compartment prescriptions, which are developed and reviewed by interdisciplinary teams and environmental analysis reports, and individual activities, the Forest Supervisor, or his deputy, makes a determination of the possible environmental impacts of any proposed action, including timber sales.

48. The Service has not filed with the Council on Environmental Quality an environmental impact statement on any of the executed or proposed sales of timber in the National Forests of Texas, nor on its practice of even-age management and predominantly single species regeneration (as the only system, instead of one of the systems of timber management).

49. The Forest Service has completed three land management plans which were accompanied by Environmental Impact Statements. Two were on the Caddo and Lyndon B. Johnson National Grasslands, and the other on the Conroe Unit of the Sam Houston National Forest. Another, the Sabine Unit Plan and Environmental Impact Statement, is in draft form and presently receiving public comment. At the time of trial, preparations for the San Jacinto Unit Charette at the end of January, 1977, were progressing.

50. The "Final Environmental Impact Statement and Unit Plan" for the proposed Conroe Unit of Sam Houston National Forest includes that part of the Raven Ranger District west of Interstate 45, but not the part containing Compartments 72 and 73. The Forest Service filed this statement with the Council on Environmental Quality on July 23, 1976.

51. In preparation of the Conroe Unit Plan and Environmental Impact Statement, the Forest Service sought public involvement. A focal point of this involvement was the "charette," a week-end workshop with members of the public invited to participate in making recommendations for future management of the Conroe Unit. Public "issues of concern" were a part of the planning packet given to each charette participant. The approximately 200 people who attended the charette were divided into ten teams and encouraged to develop additional "issues of concern".

52. Prior to the charette, the Forest Service prepared inventories of the soils, vegetation, wildlife, recreation, range, transportation, special uses, road construction areas, wilderness proposals, visually sensitive areas, and other matters for use by the public and the Forest Service in developing a plan for the Conroe Unit. A planning packet was prepared which consolidated summaries of the basic resource data. A base map and fourteen resource overlays were also given to each team.

53. A participant on one team proposed a system of uneven-aged management as an alternative to clearcutting.

54. In the public part of the charette, there was a heavy weighing toward involvement of special interest groups: only ten out of 170 charette participants could be considered as non-affiliated with public agencies, special interest organizations, private industry or education.

55. At the conclusion of the public part of the charette, the public was invited to attend the Forest Service portion of the charette, where the team recommendations were discussed by the Forest Service staff and a proposed plan was decided upon.

56. At the conclusion of the charette process on the Conroe Unit of the Sam Houston National Forest, a draft plan and impact statement were prepared and filed with the Council on Environmental Quality (CEQ). Upon being filed with the CEQ, the draft plan and impact statement were circulated to the general public. Notice of availability of the draft EIS was published in the Federal Register.

57. After an analysis of the comments on the draft Conroe Plan and Impact Statement, a final Conroe Unit Plan and Environmental Impact Statement was prepared, incorporating some suggestions and revisions, and filed with the Council on Environmental Quality.

58. The final Conroe Unit Plan and Environmental Impact Statement is deficient in the following respects:

(a) It discusses only the method of sawlog harvest which concludes in a clearcut;

(b) It barely mentions the alternative of selective harvesting of mature trees, the principal method of sawlog harvesting in the National Forests prior to 1964, and a classic method of forest management;

(c) It largely ignores the consequences of its hardwood killing practices (by which the hardwoods were reduced to six percent) and fails to consider the alternative of restoring the forests to their former balance;

(d) It fails to discuss the effects of massive (as distinguished from minor) clearcutting on wildlife, recreation, water supply, soil erosion, fire, insects, and disease;

(e) It fails to discuss the long range result of clearcutting all the commercial stands in the National Forests of Texas and planting the vast majority to one species, i. e., pine;

(f) It limits to a ten-year period its consideration of any effects;

(g) It accepts a seventy-year rotation for loblolly pine, without considering the alternative of a longer rotation;

(h) It proposes regeneration of only two upland hardwood sites in ten years, without stating any impacts of such a limitation;

(i) Although it predicts a higher crown-density of hardwoods in loblolly pine forests, the environmental impact statement gives no explanation of how magnolia, beech, oak and hickory, or other hardwood species will be brought back; the omission assumes importance, since magnolia, beech, oak, and hickory generally do not come back in top condition after a clearcut, even if planted;

(j) It discusses mainly a concentrated structural approach to recreation, and fails to discuss the economic or aesthetic advantages of use of the open forest;

(k) It fails to mention the loss of the natural ecosystem, resulting from a largely single-species regeneration, as an irreversible or irretrievable commitment of resources;

(l) It fails to consider joint recreational, water and timber use of the same area, as distinguished from segregating these uses;

(m) It fails to explain how sustained yield will be achieved; and

(n) It fails to include an adequate cost-benefit analysis.

59. The Forest Service has been taking special measures to protect the red-cockaded woodpecker for many years. Among the measures employed are protection of woodpecker habitat and establishment of special management areas for the woodpecker. The National Forests in Texas have recognized the need to provide special management for the red-cockaded woodpecker as far back as 1968. A current inventory of the location of all known active colonies is maintained at each district office and a copy of all inventories is maintained in the Forest Supervisor's Office. These colonies are inventoried annually.

60. In the development of its guidelines for the protection of the red-cockaded woodpeckers, the Forest Service worked closely with the many federal and state agencies, and specifically with the recovery team established by the Fish and Wildlife Service of the Department of the Interior. A Forest Service biologist is an active member of the recovery team. All red-cockaded woodpecker inventory data existing on the Texas National Forest has been made available to the recovery team.

61. The guidelines developed by the Forest Service essentially provide for special management of the red-cockaded woodpecker colony, which includes a 200 foot buffer zone around the aggregate of cavity trees, and the maintenance immediately adjacent to the colony of a support stand which must be of a minimum forty acres. In most cases, the Forest Service leaves a far greater support stand than the minimum forty acres.

62. As information on the red-cockaded woodpecker has evolved, so have the Forest Service guidelines designed to protect this endangered species. The recommendations of the red-cockaded woodpecker recovery team are not yet final. The Forest Service is committed to acceptance of any final recommendations of the recovery team. In this interim period, the Forest Service guidelines will not jeopardize the continued existence of the red-cockaded woodpecker.

## CONCLUSIONS OF LAW

1. This court has jurisdiction of this civil action pursuant to 28 U.S.C. § 1331(a).

2. The plaintiff has standing to bring this civil action.

3. The National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4331 *et seq.* (1970), provides:

> [I]t is the *continuing policy of the Federal Government . . . to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans.*

4. NEPA makes environmental protection a part of the mandate of every federal agency and department. *Calvert Cliffs Coordinating Committee v. A. E. C. (Calvert Cliffs),* 146 U.S.App.D.C. 33, 36, 449 F.2d 1109, 1112 (1971). Congress included in NEPA certain "action forcing" provisions in Section 102 (hereafter set out), to implement its policy of environmental protection. Conference Report on NEPA, 91st Cong., 2d Sess., 115 Cong.Rec. 40515, 40516 (1969) (remarks of Senator Jackson).

5. Section 102 of NEPA (42 U.S.C. § 4332 (1970), *as amended by* 42 U.S.C.A. § 4332(2)(D)–(I) (Supp.1976)), stipulates, in part, that:

> [T]o the fullest extent possible . . . (2) all agencies of the Federal Government shall . . . (C) include in every recommendation and report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—
>
> (i) the environmental impact of the proposed action,
>
> (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
>
> (iii) alternatives to the proposed action,
>
> (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
>
> (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.
>
> Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the . . . agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public . . . and shall accompany the proposal through the existing agency review process . . .

6. In order to comply with section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C) (1970), which requires that an agency solicit comments on its plans prior to preparing the environmental impact statement (EIS), agencies must prepare two impact statements—a draft statement and a final statement. *See* 40 C.F.R. § 1500.7(a) (1976). The draft statement must circulate for review and comment to federal and federal-state agencies that have jurisdiction by law, or have special expertise with respect to the environmental effect involved, 40 C.F.R. § 1500.9(a)(1) (1976), and to the public 40 C.F.R. § 1500.9(d) (1976). Before preparing the final statement, which must also be circulated for comment, comments on the draft statement are to be carefully evaluated and considered. C.F.R. § 1500.7(a) (1976). Copies of substantive comments received on the draft statement are to be attached to the final statement. 40 C.F.R. § 1500.10(a) (1976). Only the final statement satisfies NEPA; a draft statement prepared without the solicitation of comments does not fulfill the requirements of section 102(2)(C).

7. It is unquestioned that the initial determination of NEPA's applicability to a given action lies with the federal agency undertaking the action. *E. g., Hanly v.*

*Mitchell (Hanly I),* 460 F.2d 640, 644 (2d Cir. 1972), *cert. den. sub nom. Hanly v. Kleindienst,* 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed.2d 256 (1972). However, the federal courts disagree as to the proper standard of judicial review. Moreover, the decisions have varied as to the standard to be employed by an agency in concluding that NEPA is inapplicable.

8. One view is that an agency should be granted wide latitude in deciding NEPA's applicability to a proposed action, and relegates to the court the task of ascertaining merely whether the agency has abused its discretion by arbitrary and capricious decision-making. *See, e. g., Hanly v. Kleindienst (Hanly II),* 471 F.2d 823, 830 (2d Cir. 1972), *cert. den.,* 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973).

9. The other view subjects the agency's negative determination to close scrutiny and analyzes all relevant factors to resolve whether the agency's decision was reasonable. *Sierra Club v. Morton,* 510 F.2d 813, 819 (5th Cir. 1975); *Save Our Ten Acres v. Kreger (SOTA),* 472 F.2d 463 (5th Cir. 1973); *Minnesota Public Interest Research Group v. Butz (MPIRG),* 498 F.2d 1314, 1320 (8th Cir. 1974).

10. In *SOTA, supra,* the Court of Appeals for the Fifth Circuit declared that NEPA's basic policy was to ensure that Congress and others receiving the agency's recommendations would have a "sound basis for evaluating the environmental aspects" of the project involved. *Id.,* at 466.

The spirit of the Act would die aborning if a facile, ex parte decision that the project was minor or did not significantly affect the environment were too well shielded from impartial review. *Id.*

Emphatically rejecting the General Service Administration's contention that the limited "arbitrary and capricious" standard was the proper test of the threshold decision to comply *vel non* with NEPA's filing require-

ments, the court insisted that "the primary decision to give or bypass the consideration required by the Act must be subject to inspection under a more searching standard." *Id.,* at 466. The court enunciated this standard as a "more relaxed rule of reasonableness." *Id.,* at 465. *See also Wyoming Outdoor Coordinating Council v. Butz,* 484 F.2d 1244 (10th Cir. 1973).

11. Under Section 102 of NEPA, *supra,* a federal agency must file an impact statement on a proposed action, if it is a "major Federal action significantly affecting the quality of the human environment." In *Hanly I, supra,* 460 F.2d, at 644, the court held that the term "major federal action" referred to the cost of the project, the amount of planning that preceded it, and the time required to complete it, but did not refer to the impact of the project on the environment.

12. The primary question in defining this phrase is whether Congress intended to create one criterion or whether it intended to create two tests, whereby:

First, it must be determined whether there is a major federal action; next, if there is a major action, the impact of that action on the environment must be determined. This interpretation was adopted in *Hanly I, supra* at 644.

*MPIRG, supra,* 498 F.2d, at 1321.

13. The fallacy of the interpretation contended for in *Hanly I* was shown in *MPIRG, supra:*

By bifurcating the statutory language ["major Federal actions significantly affecting the quality of the human environment"], it would be possible to speak of a "minor federal action significantly affecting the quality of the human environment," and to hold NEPA inapplicable to such an action. Yet if the action has a significant effect, it is the intent of NEPA that it should be the subject of the detailed consideration mandated by

NEPA; the activities of federal agencies cannot be isolated from their impact upon the environment.

*Id.,* 498 F.2d, at 1321–22. It follows that a finding of significant environmental effects is the determining factor for imposition of the NEPA impact statement requirement. *See also Simmans v. Grant,* 370 F.Supp. 5, 13 (S.D.Tex.1974).

14. In *Hiram Clarke Civic Club v. Lynn,* 476 F.2d 421 (5th Cir. 1973), and in *SOTA, supra,* 472 F.2d, at 467, the Court of Appeals for the Fifth Circuit showed agreement with guidelines promulgated by the Council on Environmental Quality (CEQ):

> Significant effects can . . . include actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial.

CEQ Guidelines, 40 CFR § 1500.6(b) (1976). As stated in *Hiram Clarke, supra,* 476 F.2d, at 427, ". . . Congress was not only concerned with just adverse effects but with *all* potential environmental effects that affect the quality of the human environment."

15. Preparation of an environmental impact statement is required, even if the effects may potentially exist or are presently unknown.

> [O]ne of the functions of a NEPA statement is to indicate the extent to which environmental effects are essentially unknown . . . Reasonable forecasting and speculation is thus implicit in NEPA, and we must reject any attempt by agencies to shirk their responsibilities under NEPA by labeling any and all discussion of future environmental effects as "crystal ball inquiry".

*Scientists' Institute For Public Information, Inc. v. A. E. C. (SIPI),* 156 U.S.App.D.C. 395, 408, 481 F.2d 1079, 1092 (1973). In accordance with *Calvert Cliffs, supra,* the

Fifth Circuit found that if the project "may cause" a significant environmental impact, an EIS is required. *SOTA, supra,* 472 F.2d, at 467.

16. The CEQ Guidelines require that "significantly affecting the environment" must be taken as meaning "a view [of] the overall cumulative impact of the action proposed, related federal actions, and projects in the area, and further actions contemplated." 40 CFR § 1500.6(a) (1976). Thus, effects evolving from an action which is a small step in a larger total plan, in combination with the effects of the larger plan, meet the definition. *MPIRG, supra,* 498 F.2d, at 1320 n.18; *SOTA, supra,* 472 F.2d, at 467 n.7; *City of Rochester v. United States Postal Service,* 541 F.2d 967, 972 (2d Cir. 1976). *Cf., Kleppe v. Sierra Club,* 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976).

17. If initial agency decisions and particular or single activities are dealt with as being comparatively unimportant, thereby failing to merit EIS treatment, or as excuses for large-scale action on an after-the-fact basis, the decisions and activities may escape adequate environmental review.

> [T]o allow environmental impact statements to be filed as construction proceeds in a piecemeal fashion, thus limiting the impact and scope of an environmental analysis to relatively small segments . . . would result in ignoring the environmental impact of the entire system, in determining its ultimate effect on the environment, and in weakening the consideration of alternatives.

*Indian Lookout Alliance v. Volpe,* 484 F.2d 11, 14 (8th Cir. 1973). *See also SOTA, supra,* 472 F.2d, at 467; *MPIRG, supra,* 498 F.2d, at 1320; *Jones v. District of Columbia Redevelopment Land Agency,* 162 U.S.App. D.C. 366, 499 F.2d 502, 511 (1974), *cert. den.,* 423 U.S. 937, 96 S.Ct. 299, 46 L.Ed.2d 271 (1975); *City of Rochester v. United States Postal Service, supra,* 541 F.2d, at 972.

■ 18. NEPA created the CEQ to assist and advise the President and to review and appraise activities of the federal government in the light of NEPA policies. Courts have recognized the CEQ's role and have often used CEQ Guidelines to measure the adequacy of a federal agency's EIS, although holding them to be "merely advisory". *E. g., Environmental Defense Fund, Inc. v. Corps of Engineers (Tombigbee Waterway),* 492 F.2d 1123, 1138 (5th Cir. 1974); *Hiram Clarke Civic Club, Inc., v. Lynn, supra,* 476 F.2d, at 424. It is meaningful, then, that the CEQ Guidelines state that "[p]roposed major actions, *the environmental impact of which is likely to be highly controversial,* should be covered [by an EIS] in all cases." 40 CFR § 1500.6(a) (1976). (Emphasis added.) The expression "controversial" relates to situations where a substantial dispute exists as to the environmental effects of the proposed action and not merely to opposition to the intended use of the project. *Rucker v. Willis,* 484 F.2d 158 (4th Cir. 1973); *Hanly v. Kleindienst,* 471 F.2d 823 (2d Cir. 1972).

19. Section 11 of the CEQ Guidelines states:

> To the maximum extent practicable the section 102(2)(c) procedure should be applied to further Federal actions having a significant effect on the human environment even though they arise from projects or programs initiated prior to the Act on January 1, 1970.

40 C.F.R. § 1500.11(b) (1976). Thus, as held in *MPIRG, supra,* 498 F.2d, at 1321, when a project commenced prior to the passage of NEPA constitutes a major federal action significantly affecting the quality of the human environment, NEPA applies.

■ 20. The decision of the Forest Service, in 1964, to adopt even-age management in the National Forests of Texas obviously constituted a major federal action.

There is strong evidence in the record that the system of even-age management will significantly affect the quality of the human environment, for even though a relatively small portion of the National Forests in Texas is denuded by virtue of any one timbercutting contract awarded by the Forest Service, the cumulative effect of such massive clearcutting is vast, and will become greater, if permitted. There likewise can be no doubt that the environmental impact of a program of extensive clearcutting in these forests is controversial, despite the belief of the Forest Service that the program is beneficial. It follows that, when NEPA was enacted, the Forest Service was obligated to review the overall cumulative effect of clearcutting, so as to be able to forecast whether it might cause a significant effect on the quality of the human environment, including an indication of the extent of essentially unknown consequences.

21. The Forest Service's policy of filing negative declarations as to nearly all clearcuts, treating such activities as comparatively unimportant, so as not to require an EIS, allowed the Forest Service's decision of 1964 to escape adequate environmental review. Further, the preparation of an EIS limited only to a particular unit of the National Forests contributed to the same result, since the environmental analysis was thus confined to a relatively small portion of the forests. This breakdown of analysis into such minor components tended to make the overall effects of the program imperceptible.

22. The court, after weighing the evidence submitted at the trial of this civil action, determines that the Forest Service could not have reasonably concluded that, except in the two instances where an EIS has been prepared, the imposition of a system of even-age management in the National Forests in Texas would have no effects which would significantly degrade our human environmental quality, thus obviat-

ing the need for environmental impact statements, *SOTA, supra,* 472 F.2d, at 467.

23. The court further determines that, under even the most limited review of the Forest Service's decision not to file environmental impact statements in other than the two instances noted above, it must be found that the Service, in filing such negative declarations, acted arbitrarily and capriciously. *Hanly v. Kleindienst (Hanly II), supra.***

24. Section 102(2)(B) of NEPA requires federal agencies to "identify and develop methods and procedures . . . which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decision making along with economic and technical considerations." 42 U.S.C. § 4332(2)(B). "Existence value" (which "refers to that feeling some people have just knowing that somewhere there remains a true wilderness untouched by human hands . . . "), *MPIRG, supra,* 498 F.2d, at 1322 n.27, and sociological and psychological effects have also been mandated for inclusion in EIS's. *Hanly I, supra,* 460 F.2d, at 647. Thus, NEPA requires a thorough cost-benefit study in each case before undertaking major federal action affecting the quality of the human environment. *Calvert Cliffs, supra,* 449 F.2d, at 1128; *Natural Resources Defense Council, Inc. v. Morton,* 148 U.S. App.D.C. 5, 458 F.2d 827 (1972). As held by the Fifth Circuit,

> [A]n impact statement [must] provide "a basis for (a) evaluation of the benefits of the proposed project in light of its environmental risks, and (b) comparison of the net balance for the proposed project with the environmental risks presented by alternative courses of action."

*Environmental Defense Fund v. Corps of Engineers (Tombigbee Waterway), supra,*

** Much of the analysis and language of the foregoing Conclusions of Law were derived from Baum, Canary, Reeve and Scott, *Negative*

492 F.2d, at 1136 (quoting from *Natural Resources Defense Council, Inc. v. Morton, supra,* 458 F.2d, at 833).

25. Compliance with subsection 102(2)(B) of NEPA, however,

> cannot be fairly read to command an agency to develop or define any general or specific quantification process. * * [C]ompliance with this subsection does not require that every environmental amenity be reduced to an integer capable of insertion in a "go-no go" equation. * * * [M]any environmental values cannot be fixed even with a given project area, and . . . others are bound to vary in value from place to place and time to time.

*Id.,* 492 F.2d at 1133. *See also Sierra Club v. Morton, supra,* 510 F.2d, at 827. (*But see* Tribe, *Ways Not To Think About Plastic Trees: New Foundations for Environmental Law,* 88 Yale L.J. 1315, 1317–22 (1974) ).

26. In connection with the requirement of Subsection 102(2)(E) of NEPA, 42 U.S.C. § 4332 (1970), *as amended* by 42 U.S.C.A. § 4332(2)(D)–(I) (Supp. 1976) ), that an agency "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources," it is mandated that

> . . . the agency acknowledge and consider "responsible scientific opinion concerning possible adverse environmental effects" which is contrary to the official agency position . . . . *Committee for Nuclear Responsibility, Inc. v. Seaborg,* 149 U.S.App.D.C. 380, 463 F.2d 783, 787 (1971).

> * * * * * *

> [A] reviewing court must examine the record in detail to determine that a real

*NEPA: The Decision Not to File,* 6 Env.L. 309 (1975).

give and take was fostered on the key issues. This does not give the court a license to judge for itself how much weight should be given particular pieces of scientific or technical data, a task for which it is singularly ill-suited. It does require, however, that the court examine the record so that it may satisfy itself that the decision was based "on a consideration of the relevant factors." [Citing *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971)]. Where only one side of a controversial issue is developed in any detail, the agency may abuse its discretion by deciding the issues on an inadequate record.

*Natural Resources Defense Council, Inc. v. United States Nuclear Regulatory Commission,* 547 F.2d 633, 645–46 (D.C.Cir.1976). *See also Aeschliman v. United States Nuclear Regulatory Commission,* 547 F.2d 622, 629 (D.C.Cir.1976).

[N]o major federal project should be undertaken without intense consideration of other more ecologically sound courses of action, including shelving the whole project, or of accomplishing the same result by entirely different means. * * * [T]he congressional mandate to develop alternatives would be thwarted by ending the search for other possibilities at the first proposal which establishes an ecological plus, even if such a positive value could be demonstrated with some certainty.

*Environmental Defense Fund, Inc. v. Corps. of Engineers (Tombigbee Waterway),* supra, 492 F.2d, at 1135.

A reviewing court must assure itself not only that a diversity of informed opinion was heard, but that it was genuinely considered. * * * [W]here apparently significant information has been brought to [the agency's] attention, or substantial issues of policy or gaps in its reasoning raised, the statement * * * must indicate why the agency decided the criticisms were invalid. [Citing *Portland Cement Ass'n v. Ruckelshaus,* 158 U.S.App.

D.C. 308, 486 F.2d 375, 393–95 (1973), *cert. denied,* 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974)] * * * [W]hat is required is a reasoned response, in which the agency points to particulars in the record which, when coupled with its reservoir of expertise, support its resolution of the controversy. [Citation omitted.] An agency may abuse its discretion by proceeding to a decision which the record before it will not sustain, in the sense that it raises fundamental questions for which the agency has adduced no reasoned answers.

*Natural Resources Defense Council, Inc. v. United States Nuclear Commission, supra,* 547 F.2d, at 646.

The court's task is to determine whether the EIS was compiled with objective good faith and whether the resulting statement would permit a decisionmaker to fully consider and balance the environmental factors.

*Sierra Club v. Morton, supra,* 510 F.2d, at 819. *But see Environmental Defense Fund, Inc. v. Corps of Engineers (Tombigbee Waterway), supra,* 492 F.2d, at 1136.

. . . NEPA assumes as inevitable an institutional bias within an agency proposing a project and erects the procedural requirements of § 102 to insure that "there is no way [the decision maker] can fail to note the facts and understand the very serious arguments advanced by the plaintiffs if he carefully reviews the entire environmental impact statement." [*Environmental Defense Fund v. Corps of Engineers,* 342 F.Supp. 1211, 1218 (E.D. Ark.1972).]

*Environmental Defense Fund v. Corps of Engineers,* 470 F.2d 289, 295 (8th Cir. 1972).

Then, if the decisionmakers choose to ignore such factors, they will be doing so with their eyes wide open.

*Environmental Defense Fund v. Corps of Engineers,* 325 F.Supp. 749, 759 (E.D.Ark. 1971) (cited with approval by the Fifth Circuit in *Environmental Defense Fund v.*

*Corps of Engineers (Tombigbee Waterway), supra,* 492 F.2d, at 1136).

27. At least in the NEPA context, an agency has the affirmative obligation to explore the issues in depth, rather than wait passively until an intervenor takes the initiative. *See Calvert Cliffs' Coordinating Comm. v. AEC,* . . . note 14, 449 F.2d at 1118–19. \* \* \* "[W]hen the record is deficient, the [agency] may even have a duty to consider issues ignored by the parties." [Note, "The Use of Generic Rulemaking to Resolve Environmental Issues in Nuclear Power Plant Licensing," 61 Va.L.Rev. 869, at 891.]

In both *Calvert Cliffs* and *Scenic Hudson* [*Preservation Conference v. FPC,* 354 F.2d 608, 620–621 (2 Cir. 1965), *cert. denied,* 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 540 (1966)], the court pointed out that poorly-financed public interest intervenors may lack the wherewithal to marshal technical evidence and bring it to the [agency's] attention.

*Natural Resources Defense Council v. United States Nuclear Regulatory Commission, supra,* 547 F.2d, at 645 n. 34.

28. Both sides having buttressed their respective positions by scientific evidence from reputable sources, it is manifest that a substantial dispute existed as to the environmental effects of clearcutting. It is also evident that this controversy is not limited to the National Forests of Texas. *See, e. g., Wyoming Outdoor Coordinating Council v. Butz, supra,* 484 F.2d, at 1249–50; *West Virginia Division of Izaak Walton League of America v. Butz, supra,* 522 F.2d 945; Senate debates on National Forest Management Act of 1976, 94th Cong., 2d Sess., 122 Cong.Rec. 14513–16 (1976) (remarks of Senator Randolph). Yet in the face of the highly controversial nature of its clearcutting program, the Forest Service, in violation of CEQ Guidelines, saw fit to make only one reference in the EIS for the Conroe Unit of the Sam Houston National Forest to an alternative forest management system, a definition of "All-aged Forest or Uneven-aged Forest" (page 46, EIS).

29. Three management options are shown on page 74 of the EIS:
1. Practice intensive high yield, short rotation forestry to maximize wood product production.
2. Practice highly modified forestry with objective of producing high yields of recreation, wildlife and natural scenery with reduced timber yields.
3. Practice sustained yield, multiple use forestry with timber production in harmony with other resources.

It is possible to infer that the second option had relation to uneven-aged management, and that the third applied to the ongoing even-aged system. However, no explication was afforded to demonstrate the superiority of the third option, which was the one chosen by the Forest Service.

30. At the public "Charette", mention was made by one participant of the alternative of uneven-aged management. Nevertheless, the EIS makes no mention of or comment upon the suggestion.

31. The Forest Service's failure to explore the feasibility of uneven-aged management in the EIS for the Conroe Unit amounted to a breach of its duty to acknowledge and consider responsible scientific opinion contrary to its official position. The uneven-aged management system was described by a witness for the Forest Service as "classic". Thus, the Forest Service's failure to take into account the uneven-aged system as an alternative to clearcutting constituted a violation of both the procedural and substantive provisions of NEPA, specifically, the requirement that an agency obtain information on the effects of and alternatives to a proposed action and consider this information when making a decision on the proposed action. 42 U.S. C.A. § 4332 (1970), *as amended by* 42 U.S.

C.A. § 4332(1)(D)–(I). *Environmental Defense Fund, Inc. v. Corps of Engineers (Tombigbee Waterway), supra,* 492 F.2d, at 1135, 1139–40 n. 33; *Sierra Club v. Morton, supra,* 510 F.2d, at 825, 829. As stated by the Court of Appeals for the Second Circuit in *Natural Resources Defense Council v. Callaway,* 524 F.2d 79, 92–93 (2d Cir. 1975):

> It is absolutely essential to the NEPA process that the decisionmaker be provided with a detailed and careful analysis of the relative environmental merits and demerits of the proposed action and possible alternatives, a requirement that we have characterized as "the linchpin of the entire impact statement," *Monroe County Conservation Society v. Volpe,* 472 F.2d at 697–98. Indeed the development and discussion of a wide range of alternatives to any proposed federal action is so important that it is mandated by NEPA when any proposal "involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(D).

This non-observance of the law by the Forest Service can only be characterized as arbitrary and capricious.

32. The EIS prepared for the Conroe Unit of the Sam Houston National Forest was not compiled with objective good faith by the Forest Service. Its presentation of tree harvesting methodology was one-sided to the extreme; and there existed no way by which, from an examination of the document, a decisionmaker could have understood that there were alternatives, even if he had carefully reviewed the EIS. Since one of the relevant factors was not given consideration in the EIS, the Forest Service's violation of the demands of NEPA in this respect constituted an abuse of its discretion.

33. The absence of a cost-benefit analysis was noted by a commentator on the draft EIS. The only response of the Forest Service was as follows:

> Detailed job lists which include cost data are an integral part of the plan. However, because of length, they are not reproduced as a part of the distributed plan. Cost/benefit types of analyses are difficult in such an extensive plan as this and, because we are dealing with amenity (rather than monetary values), they are often difficult to interpret.

Page 126, Final Environmental Impact Statement and Unit Plan, Sam Houston National Forest. The nonfulfillment of the requirement for a cost-benefit analysis also results in a legally insufficient EIS. *Sierra Club v. Froehlke (Trinity-Wallisville Project),* 359 F.Supp. 1289, 1362–65; (S.D. Tex.1973), *rev'd on other grounds sub nom. Sierra Club v. Callaway,* 499 F.2d 982 (5th Cir. 1974); *Calvert Cliffs, supra,* 449 F.2d, at 1128; *Environmental Defense Fund, Inc. v. Corps of Engineers (Tombigbee Waterway), supra,* 492 F.2d, at 1134–35.

34. The CEQ's Guidelines provide:

> [A]n environmental statement should be prepared if it is reasonable to anticipate a cumulatively significant impact on the environment from Federal Action.

40 C.F.R. § 1500.6(a) (1976).

35. The CEQ has also issued guidelines stating the advantages of a programmatic EIS: "it provides an occasion for a more exhaustive consideration of effects and alternatives than would be practicable in a statement on an individual action. It ensures consideration of cumulative impacts that might be slighted in a case-by-case analysis. And it avoids duplicative reconsideration of basic quality questions." CEQ, Memorandum to Federal Agencies on Procedures for Improving Environmental Impact Statements (May 16, 1972), quoted in *SIPI, supra,* 481 F.2d, at 1087–88.

36. In *Kleppe v. Sierra Club, supra,* 427 U.S., at 410, 96 S.Ct., at 2730, the Supreme Court held:

> [W]hen several proposals for coal-related actions that will have cumulative or synergistic environmental impact upon a re-

gion are pending concurrently before an agency, their environmental consequences must be considered together. Only through comprehensive consideration of pending proposals can the agency evaluate different courses of action.

37. The Court further held:

Cumulative environmental impacts are . . . what require a comprehensive impact statement.

*Id.,* at 413, 96 S.Ct., at 2732.

38. The National Forests of Texas are all situated in the region known as East Texas. The program to clearcut all timber left available for timber management purposes in the National Forests of Texas was decided upon by the Forest Service in 1964. At the trial of this civil action, the Forest Supervisor proposed to continue the program to completion. It is clear that the program of clearcutting, if permitted to continue, may cause significant cumulative or synergistic impacts upon the quality of the human environment in the entire region. Under these circumstances, the Forest Service's failure to file a programmatic EIS relating to the program at any time subsequent to the passage of NEPA was arbitrary and capricious. Moreover, such a programmatic EIS is required in order that:

(1) Exhaustive consideration can be given to the cumulative or synergistic environmental impact of the program on the region;

(2) A thorough analysis of alternatives to the program can be conducted; and

(3) Duplicative reconsideration of the program can be avoided.

39. The programmatic EIS concerned with clearcutting in the National Forests of Texas should be prepared in accordance with NEPA and should (without limitation of the generality of the foregoing) disclose the following:

(1) the suitability of the various portions of such National Forests for timber management;

(2) inventory data on the various renewable resources, including pertinent maps, graphic material, and explanatory aids;

(3) special conditions or situations involving hazards to such resources occasioned by clearcutting and their relationship to alternative activities;

(4) the economic and environmental aspects of the related systems of silviculture which could be employed in the National Forests of Texas, and methods to protect forest resources;

(5) provisions already made or to be made for outdoor recreation, including wilderness (if any), range, timber, watershed, wildlife and fish, and any significant beneficial or harmful effects thereto which may result from clearcutting;

(6) provisions already made or to be made for diversity of plant and animal communities, and any significant effect which clearcutting may have thereon;

(7) steps to be taken to preserve the diversity of tree species similar to those existing in the East Texas region, and how they may be affected by the program of clearcutting;

(8) evaluation of the likely effects of each forest management system, as to whether it will produce substantial and permanent impairment of productivity of the lands encompassed in such National Forests;

(9) The extent to which considerations of dollar return and unit output of timber may figure into the decision to clearcut;

(10) The basis upon which the designated rotation period is chosen;

(11) why clearcutting, seed tree cutting, or other cuts chosen to regenerate an

even-age stand of timber was found to be the optimum method;

(12) whether, when timber is harvested by clearcutting—

(a) soil, slope, or watershed conditions are likely to be irreversibly damaged;

(b) there is assurance that lands subjected to such cutting method can be adequately restocked within five years after harvest; and

(c) protection is provided by streams, streambanks, shorelines, lakes, wetlands, and other bodies of water from detrimental changes in water temperatures, blockages of water courses, and deposits of sediment, where harvests are likely seriously and adversely to affect water conditions or fish habitat.

40. Recent legislation requires that the Secretary of Agriculture promulgate regulations, "under the principles of the Multiple-Use Sustained-Yield Act of 1960, that set out the process for the development and revision of land management plans," by October 22, 1978. 16 U.S.C.A. § 1604(g) (1976). Specific reference is made in the statute to the instances when clearcutting will be permitted, 16 U.S.C.A. § 1604(g) (3)(F)(i) (1976)—"when it is determined to be the optimum method." It is to be noted that this contrasts with the standard for any other cutting method, that is, in instances when "it is determined to be appropriate."

41. In view of the imminence of the promulgation of these regulations, it is not necessary that the validity of plaintiff's claim that the Forest Service is presently violating the Multiple-Use Sustained-Yield Act of 1960 be inquired into.

42. It has been stated that

. . . in the absence of extraordinary equities on the government's side, the requirement of an impact statement must be enforced by an injunction whenever the proposed project poses a substantial risk of damage to the environment and there exists a reasonable possibility that adequate consideration of alternatives might disclose some realistic course of action with less risk of damage.

*Sierra Club v. Mason,* 351 F.Supp. 419, 427 (D.Conn.1972). Because of the probability that an irreversible commitment of resources is now being made, the Forest Service's clearcutting activities pose a substantial threat of irreparable injury such as to warrant injunctive relief. While mindful of the economic and social costs which may result from the issuance of an injunction here, the court is nevertheless persuaded that the equities require such action. "[C]ompliance with NEPA invariably results in delay and concomitant cost increases, and Congress has implicitly decided that these costs must be discounted." *Steubing v. Brinegar,* 511 F.2d 489, 497 (2d Cir. 1975).

43. Plaintiff is thus entitled to an injunction which will permanently enjoin defendant from permitting any clearcutting, seed tree cutting, shelter-wood cutting, or other cuts designed to regenerate even-ages stands of timber in the National Forests of Texas until such time as: (1) defendant has prepared a programmatic EIS (including the requirements set forth in Conclusion of Law No. 39, *supra*), in accordance with the various procedures specified in Conclusion of Law No. 6, *supra*; (2) the final programmatic EIS has received the approval of this court; and (3) such final programmatic EIS has, afterwards, been filed with the CEQ.

44. Plaintiff is entitled to no relief other than that specifically mentioned in these Conclusions of Law.

45. This court should retain jurisdiction of this civil action, in order to superintend the effectuation of the injunction to which reference is herein made.

[See following illustration]